UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



BRANDON WILLIAMS,

        Plaintiff,

v.

                               Civil No. 2:22cv388

STEVEN B. STONE,

and
JOHN D. MCCLANAHAN,

and
RODNEY VAN FAUSSIEN,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by Defendant John D. McClanahan ("Officer McClanahan), ECF No. 100, and a separate motion for summary judgment filed by Defendants Steven B. Stone ("Officer Stone") and Rodney Van Faussien ("Officer Van Faussien"), ECF No. 108. The Court finds that oral argument is unnecessary because the facts and legal argument are adequately presented in the parties' briefs. For the reasons set forth below, the Court **DENIES** both motions.

### I. PROCEDURAL BACKGROUND

On September 15, 2022, Plaintiff Brandon Williams ("Plaintiff") filed a complaint in this Court against Officers McClanahan and Stone and "Sargent M. Mitchell." ECF No. 1. Plaintiff alleged that after he was involved in a serious car

accident, the named defendants jointly retaliated against him by filing a false accident report because Plaintiff had accused Officer McClanahan of lying during a criminal trespass trial held earlier that year. Plaintiff's complaint asserted seven causes of action, five pursuant to 42 U.S.C. § 1983, including a retaliation claim and a conspiracy claim, and two pursuant to Virginia state law based on intentional infliction of emotional distress ("IIED"). ECF No. 1. Shortly thereafter, Plaintiff filed an amended complaint adding an additional claim against the City of Norfolk, asserting that the City was responsible for the constitutional violations alleged in the original complaint.[1] ECF No. 2. After Plaintiff filed a second amended complaint adding Officer Van Faussien as a defendant, ECF No. 48, the defendants filed two motions seeking to dismiss the second amended complaint, ECF Nos. 49, 54.

On July 13, 2023, this Court issued an Opinion and Order granting both motions to dismiss as to counts one through five of Plaintiff's second amended complaint and dismissing the remaining state claims without prejudice. Williams v. Mitchell, 682 F. Supp. 3d 503, 519 (E.D. Va. 2023), rev'd in part and vacated in part, 122 F.4th 85 (4th Cir. 2024). As relevant here, the Court dismissed Plaintiff's retaliation claim because Plaintiff had not

---

[1] On February 8, 2023, Plaintiff's claim against the City of Norfolk was dismissed without prejudice pursuant to a Rule 41 stipulation of dismissal. ECF No. 37.

adequately pled that the alleged retaliatory conduct "resulted in any 'meaningful adversity.'"   Williams, 682 F. Supp. at 511. Further, the Court dismissed Plaintiff's conspiracy claim finding that Plaintiff did not sufficiently allege the violation of a constitutional right.  Id. at 518-19.  Because the Court dismissed all federal claims, the Court dismissed Plaintiff's remaining state law IIED claims on jurisdictional grounds.  Id. at 519.

Plaintiff appealed the dismissal of his retaliation claim, conspiracy claim, and state law IIED claims.  The Fourth Circuit found that Plaintiff's second amended complaint sufficiently alleged that the officers' intentional misrepresentations on the police report were "materially adverse" to Plaintiff's exercise of his constitutional rights in the context of a retaliation claim and reversed this Court's dismissal of the retaliation claim. Williams v. Mitchell, 122 F.4th 85, 90-91 (4th Cir. 2024).  The Fourth Circuit also remanded Plaintiff's conspiracy and IIED claims for this Court's reconsideration.[2]  Id. at 91-92.

On July 24, 2025, Officer McClanahan filed a motion for summary judgment, ECF No. 100, and one week later Officers Stone and Van Faussien collectively moved for summary judgment, ECF No. 108.  In support of his motion, Officer McClanahan submitted:

---

[2] After the case was remanded to this Court, Sargent M. Mitchell was dismissed from this action with the agreement of all parties.  ECF No. 79. Additionally, it appears from the summary judgment record that Plaintiff is now only proceeding on one of the two state law IIED claims (Count VII). See ECF No. 101, at 1.

(i) his own affidavit ("McClanahan Aff."), ECF No. 101-1; (ii) an excerpt of Plaintiff's deposition, ECF No. 101-2; (iii) an excerpt of the deposition of Norfolk Assistant City Attorney Kristopher McClellan, ECF No. 101-3; (iv) video footage from Officer Herman W. Martin's body camera ("Martin Video"), ECF No. 101-4; (v) an excerpt of Officer McClanahan's deposition, ECF No. 101-5; (vi) an excerpt of Officer Stone's deposition, ECF No. 101-6; and (vii) a letter of representation from Plaintiff's former counsel, ECF No. 101-7. As for Officers Stone and Van Faussien, they submitted the following evidence in support of their motion: (i) the transcript of Officer Van Faussien's deposition, ECF No. 109-1; (ii) an excerpt of the deposition of Norfolk Assistant City Attorney Kristopher McClellan, ECF No. 109-2; (iii) an excerpt of Plaintiff's deposition, ECF No. 109-3; (iv) the transcript of Officer Stone's deposition, ECF No. 109-4; (v) video footage from Officer Stone's body camera ("Stone Video"), ECF No. 109-5; (vi) video footage from Officer Herman W. Martin's body camera ("Martin Video"), ECF No. 109-6; and (vii) Officer Stone's "Police Crash Report," ECF No. 109-7.

Plaintiff timely filed opposition briefs to both summary judgment motions, attaching the following supporting materials: (i) his own affidavit ("Williams Aff."), ECF No. 112-1; (ii) an excerpt of Officer McClanahan's interrogatory answers, ECF No. 112-2; (iii) an excerpt of Officer McClanahan's deposition, ECF

4

No. 112-3; (iv) the summons for Plaintiff's criminal trespass charge, ECF No. 112-4; (v) the affidavit of Plaintiff's father Kenneth Ferguson ("Ferguson Aff."), ECF No. 112-5; (vi) the affidavit of Commonwealth's Attorney for the City of Hampton Anton A. Bell ("Bell Aff."), ECF No. 112-6; (vii) the transcript of the deposition of Norfolk assistant city attorney Kristopher McClellan, ECF No. 112-7; (viii) an order from the Norfolk Circuit Court dismissing Plaintiff's criminal trespass charge, ECF No. 112-8; (ix) an excerpt of Officer Van Faussien's deposition, ECF No. 112-9; (x) an excerpt of Officer Stone's deposition, ECF No. 112-10; (xi) Officer Stone's Police Crash Report, ECF No. 112-11; (xii) a blood alcohol test result from the driver who caused the crash, ECF No. 112-12; (xiii) a letter from an accident reconstruction consultant, ECF No. 112-13; and (xiv) screenshots taken from the officers' body camara footage, ECF No. 112-14.

Thereafter, the officers filed their respective reply briefs. ECF Nos. 123, 128. Accordingly, both summary judgment motions are ripe for adjudication.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

For purposes of summary judgment, the following are the undisputed material facts[3] that are relevant to Plaintiff's remaining claims:

---

[3] Where the facts are disputed, the Court is required to recount such facts in the light most favorable to Plaintiff, as the non-moving party, and draw

## A. Plaintiff's Criminal Trespass Proceedings

On January 8, 2020, Plaintiff was parked in the lot of a Norfolk city park when he was approached by Officer McClanahan, who charged Plaintiff with criminal trespass. Williams Aff. ¶¶ 2-3, 5. Unbeknownst to Officer McClanahan, Plaintiff recorded the audio of this encounter. Id. at ¶ 4. On February 13, 2020, Plaintiff appeared in Norfolk General District Court for trial on the trespassing charge. Id. ¶ 6. At the trial, Officer McClanahan testified against Plaintiff as the charging officer. Id. ¶ 7. After Officer McClanahan's testimony, the Court asked Plaintiff if he had anything to say, and Plaintiff accused the officer of lying during his testimony, offering to play the recording of his encounter with McClanahan. Id. ¶¶ 8-9. The Court denied Plaintiff's request and found Plaintiff guilty of trespassing, and Plaintiff appealed his conviction to Norfolk Circuit Court, thus entitling him to a de novo trial. Id. ¶¶ 10, 12.

Plaintiff's father, who was an Assistant Chief of Police in the City of Hampton, had listened to the audio recording, attended the trial and considered Officer McClanahan's testimony to be false. Ferguson Aff. ¶¶ 2-7. After the trial, Plaintiff's father reported Officer McClanahan's conduct to the Commonwealth Attorney of Hampton, Anton A. Bell, who agreed that the officer was

---

all reasonable inferences from the record in his favor. Finley v. Kraft Heinz Inc., 146 F.4th 382, 388 (4th Cir. 2025).

untruthful after discussing his testimony with Plaintiff's father and hearing the recording. Id. ¶¶ 9-10; Bell Aff. ¶¶ 2-6. Thereafter, Mr. Bell contacted the Norfolk's Commonwealth Attorney at that time, Greg Underwood, and provided a copy of the recording. Bell Aff. ¶¶ 7-9. After investigating the incident, Mr. Underwood agreed that Officer McClanahan had not been truthful and called the City Attorney for the City of Norfolk, Bernard Pishko. Id. ¶¶ 10-13. After Mr. Underwood shared McClanahan's apparent misconduct with Mr. Pishko, the latter replied that "he was standing by his officer." Id. ¶¶ 13-14.

On September 15, 2020, Plaintiff appeared in Norfolk Circuit Court for a de novo trial of his trespassing conviction. Williams Aff. ¶¶ 13-14. Before the trial, the City Attorney offered to not prosecute Plaintiff's trespass charge if he apologized to McClanahan, but Plaintiff declined. Id. ¶ 14. Although the trial was initiated in Circuit Court, Officer McClanahan did not appear at the trial. McClanahan Aff. ¶ 6. Plaintiff, for his part, provided the Court with evidence supporting his innocence and also informed the Court that he had an audio recording. Williams Aff. ¶¶ 15-16. Ultimately, the Circuit Court dismissed Plaintiff's trespass charge. Id. ¶ 17; ECF No. 112-8.

## B. Traffic Accident and Report

On September 30, 2020 — just 15 days after dismissal of the trespass charge and approximately 7 months after the first trespass

trial — Plaintiff was involved in a serious traffic accident. ECF No. 112-11. At the time of the crash, Plaintiff was driving his car northbound across a bridge when Rex Aman, who was driving a pickup truck southbound, swerved to the left, crossed the median into oncoming traffic, and struck Plaintiff's car head-on. Id. at 4. Plaintiff's car was wrecked while Aman's truck crashed though the bridge guardrail, flew off the bridge, and landed upside-down in a wetland. Martin Video, at 01:16 – 01:37.

Officers Stone and Herman W. Martin ("Officer Martin") were dispatched to the accident, and when they arrived Officer Martin went to speak with Plaintiff while Officer Stone walked underneath the bridge to speak with Aman. Stone Video, at 01:09 – 03:06; Martin Video, at 01:16 – 01:47. Both officers asked the drivers about the accident, compiled identifying information, and stayed near the drivers until the paramedics arrived and then took the drivers to an ambulance. Stone Video, at 03:02 – 15:30; Martin Video, at 01:47 – 15:52. During Officer Stone's interaction with Aman, Aman explained that: (1) he had swerved left and collided with Plaintiff because of a steering defect; (2) he was driving 45 miles per hour (in a 35 m.p.h. zone); and (3) he had not consumed alcohol. Stone Video, at 09:18 – 09:38; 22:59 – 23:26. In addition to speaking with Plaintiff, Officer Martin interviewed an eyewitness, who stated that Aman: (1) was swerving prior to the accident and crossing the median; (2) was driving such that "it

looked like he was in a trance" or "sleeping"; (3) had hit a tree before the accident; (4) was driving about 75 miles per hour (in a 35 m.p.h. zone); and (5) turned across the median and hit Plaintiff. Martin Video, at 08:54 - 09:13. Officer Martin's body camera footage also reveals that some police officers commented that based on the nature of the accident, Aman was likely driving above the speed limit, id. at 33:28 - 33:33; 33:40 – 33:58, while others questioned whether Aman was intoxicated, id. at 20:17 - 20:22; 25:16 - 25:18.

While Plaintiff was inside the ambulance being treated, Plaintiff avers that he saw Officer McClanahan lingering around, looking at and smirking at Plaintiff in an apparent attempt to intimidate him.[4] Williams Aff. ¶¶ 20-25. Further, Officer McClanahan, who was initially involved in traffic control at the crash site, McClanahan Aff. ¶ 9, later told Officer Martin that an additional witness had told him that Aman had lost control, jumped the curb, and hit Plaintiff's car, id. at ¶¶ 10-11; Martin Video, at 24:34 – 24:43; 27:05 – 27:21.

Once the drivers were taken to the hospital, most of the officers present remained around the accident scene, including Officers Van Faussien, McClanahan, and Stone. At one point, while

---

[4] While this fact is disputed by Officer McClanahan, such fact is supported by Plaintiff's sworn affidavit. Accordingly, as required at this stage of the proceedings, the Court views this evidence in the light most favorable to Plaintiff, who is the non-moving party. Wannamaker-Amos v. Purem Novi, Inc., 126 F.4th 244, 254 (4th Cir. 2024).

Officers Stone and Martin were briefing another officer on the accident, Officer Van Faussien asked Officer Martin whether Plaintiff had any connection to Hampton.[5] Id. at 32:36 – 32:40. Officer Martin explained that Plaintiff's father is the Assistant Chief of Police in Hampton, to which Officer Van Faussien replied: "[t]his is the guy that gave [Officer] McClanahan a ration of shit" and then asked where McClanahan was. Id. at 32:39 – 32:50. After asking for Plaintiff's name, Officer Van Faussien left to talk with Officer McClanahan. Id. at 33:00 – 33:58.

Six days after the accident, Officer Stone filed the Police Crash Report. ECF No. 112-11. The report listed, among other things, that: (1) Aman was driving 35 miles per hour; (2) Aman had not been drinking; and (3) Aman's vehicle had a steering defect. Id. at 1-2.

### III. STANDARD OF REVIEW

Summary judgment is appropriate only when a court, viewing the record as a whole in the light most favorable to the nonmoving party and drawing all inferences in their favor, determines that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S.

---

[5] After Plaintiff told Officer Martin that Plaintiff's father was the Assistant Chief of Police in Hampton, Martin Video, at 03:18 – 03:24, Officer Martin relayed this information to other officers at the scene, id. at 31:20 – 31:24.

317, 322-24 (1986).  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party . . . [and] [a] fact is material if it might affect the outcome of the suit under the governing law."  Jacobs v. N.C. Admin. Off of the Cts., 780 F.3d 562, 568 (4th Cir. 2015) (citations omitted).  The moving party has the initial burden to show "the absence of an essential element of the nonmoving party's case" and to demonstrate that the moving party "is entitled to judgment as a matter of law."  McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718 (4th Cir. 2003) (citing Celotex Corp., 477 U.S. at 322-23); Fed. R. Civ. P. 56.

Once the moving party has met this burden, the nonmoving party must then come forward with specific facts showing that there is a genuine issue of material fact for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Importantly, the facts advanced in support of or in opposition to a summary judgment motion must be supported by: (1) "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations; or (2) showing that the materials cited by the other party "do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  To successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations and "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale

v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985); see Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002). Rather, there must be sufficient evidence that would enable a reasonable fact finder to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Although the Court is not "to weigh the evidence and determine the truth of the matter" at the summary judgment phase, the Court is required to "determine whether there is a genuine issue for trial." Tolan v. Cotton, 572 U.S. 650, 656 (2014) (quoting Anderson, 477 U.S. at 249); see Jacobs, 780 F.3d at 568-69. In determining whether there is a genuine issue for trial, "[t]he relevant inquiry . . . is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" United States v. 8.929 Acres, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Anderson, 477 U.S. at 251-52).

### IV. DISCUSSION

Following remand, Plaintiff has three remaining claims against Officers Stone, McClanahan, and Van Faussien: (1) a retaliation claim; (2) a conspiracy claim; and (3) a state-law IIED claim. Officer McClanahan separately, and Officers Stone and Van Faussien jointly, moved for summary judgments as to all claims arguing that the undisputed facts support judgment as a matter in law in Defendants' favor. Moreover, Defendants raise a qualified

immunity defense as to Plaintiff's retaliation claim. The Court will first address Plaintiff's retaliation claim and Defendants' qualified immunity defense, and then address the remaining conspiracy and IIED claims.

## A. Constitutional Retaliation Claim

Plaintiff's first cause of action alleges that Defendnats violated his constitutional right to be free from retaliation by a public official after exercising his First and Sixth Amendment rights. ECF No. 48 ¶¶ 30-35. Plaintiff specifically contends that Defendants intentionally falsified the Police Crash Report — thwarting Plaintiff's potential civil recovery of damages suffered in the accident — to retaliate against Plaintiff for recording Officer McClanahan and accusing him of lying under oath. The three elements of a retaliation claim are: (1) the plaintiff engaged in constitutionally protected activity; (2) the defendants took some action that adversely affected his constitutional rights; and (3) there was a causal relationship between the protected activity and the defendants' conduct. <u>Williams</u>, 122 F.4th at 89.

### 1. Protected Activity

To satisfy the first element of his retaliation claim, Plaintiff must show that he engaged in First or Sixth Amendment protected conduct. Plaintiff argues that the record shows he engaged in First Amendment protected speech when he: (1) recorded

his interaction with Officer McClanahan; and (2) pointed out that Officer McClanahan's trial testimony was false.  ECF No. 112, at 16-19.  Moreover, Plaintiff avers that he was exercising his Sixth Amendment trial rights when he: (1) demanded a trial on the trespassing charge; (2) confronted Officer McClanahan's false testimony at the first trial; and (3) appealed his conviction to Norfolk Circuit Court and appeared for a second trial where he was again prepared to confront McClanahan.  Id.

All Defendants readily concede that Plaintiff engaged in protected speech when he recorded his interaction with Officer McClanahan in January of 2020.  It is likewise undisputed that Plaintiff's oral statements disputing the accuracy of McClanahan's testimony were an exercise of free speech.  As to the Sixth Amendment claim, all three Defendants contend that Plaintiff did not engage in Sixth Amendment protected activity because Plaintiff did not introduce evidence in the Norfolk Circuit Court showing that McClanahan had lied at the first trial.  ECF Nos. 101, at 12-13; 109, at 10-11.

Notwithstanding Defendants' argument to the contrary, the fact that Plaintiff did not formally introduce evidence in the Circuit Court before his charges were dismissed does not negate his prior exercise of his Sixth Amendment rights.  As the Fourth Circuit has explained, "demanding a trial on the trespassing charge and challenging McClanahan's testimony at trial" constitutes

14

protected Sixth Amendment activity.  <u>Williams</u>, 122 F.4th at 89.
In addition to exercising his Sixth Amendment rights in Norfolk
General District Court, Plaintiff engaged in protected conduct
when he appealed his conviction to the Norfolk Circuit Court and
appeared for his <u>de</u> <u>novo</u> public trial so that he could again
confront McClanahan.  <u>See</u> <u>Bell v. Jarvis</u>, 236 F.3d 149, 165 (4th
Cir. 2000) (en banc) ("'The central aim of a criminal proceeding
is to try the accused fairly' and the public trial guarantee serves
the purpose of 'ensuring that judge and prosecutor carry out their
duties responsibly, encouraging witnesses to come forward, and
discouraging perjury.'" (cleaned up) (quoting <u>Waller v. Georgia</u>,
467 U.S. 39, 46 n.4 (1984))).  Because the First Amendment conduct
is conceded, and the record reveals that Plaintiff engaged in Sixth
Amendment protected conduct at both of his trials, Defendants'
challenges to the first element of Plaintiff's retaliation claim
fail.

### 2. Whether Defendants' Conduct Constituted an Adverse Action

Moving to the second element, a plaintiff has suffered an
adverse action "if the defendant's allegedly retaliatory conduct
would likely deter 'a person of ordinary firmness' from the
exercise of" his constitutional rights in the future.
<u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d
474, 500 (4th Cir. 2005) (internal citations omitted).  That is,

"a plaintiff must show that a defendant's conduct resulted in more than a de minimis inconvenience" to their exercise of constitutional rights. Williams, 122 F.4th at 90. The defendant's conduct does not need to "constitute a constitutional violation in itself," and "the significance of any given act of retaliation will often depend upon the particular circumstances." Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006)). Notably, the Fourth Circuit clarified in the context of Plaintiff's case-specific retaliation claim that, accepting the allegations in Plaintiff's second amended complaint as true, an intentional misrepresentation of an accident report by law enforcement satisfies the adverse action element. Id. at 91.

Plaintiff argues that Officer Stone's crash report — created in conjunction with Officers McClanahan and Van Faussien — satisfies this element because it contained three intentional factual misrepresentations: (1) Aman's speed before the crash; (2) whether Aman was driving under the influence of alcohol; and (3) the mechanical condition of Aman's vehicle. Conversely, the officers' summary judgment motions argue that there is no evidence that the Police Crash Report contained any intentional factual misrepresentation. Specifically, Officer McClanahan argues that because he did not contribute to the information in the report, he could not have intentionally falsified the report. ECF No. 101, at 11. Officer Van Faussien similarly contends that the

16

evidentiary record lacks any evidence suggesting that he made any intentional or negligent misrepresentations. ECF No. 109, at 12. Further, Officer Stone argues that there is no evidence suggesting that the errors in his report were anything other than a "simple error." Id. at 13.

As to Officers McClanahan and Van Faussien's position, Plaintiff appears to argue that while these officers did not sign the Police Crash Report, a jury could infer from the evidentiary record that because these officers had animus towards Plaintiff, they encouraged Officer Stone to file an inaccurate report. ECF No. 112, at 19-20, 22. As summarized above, Plaintiff had previously accused Officer McClanahan of committing perjury and reports of McClanahan's misconduct were circulating among officials from multiple cities. It appears from the summary judgment record that Officer Van Faussien and at least one other officer knew about Plaintiff's accusations against McClanahan. See ECF No. 112-9, at 3 (indicating that Officer Van Faussien "was under the impression that [Plaintiff] had filed an internal affairs complaint on Officer McClanahan" and that an unnamed officer had informed Van Faussien of this complaint). Further, the fact that, following notification of Norfolk officials, McClanahan did not appear for the Circuit Court trial on Plaintiff's trespassing charge may be reasonably interpreted as circumstantial evidence that McClanahan: (1) wanted to avoid having his prior perjury

17

publicly revealed; and (2) had a motive to retaliate against the person who nearly revealed his perjury in a public setting. McClanahan Aff. ¶ 6; Bell Aff. ¶¶ 6, 13-15.

The conduct by Officers McClanahan and Van Faussien at the scene of the accident further suggests they were hostile towards Plaintiff. Plaintiff's sworn affidavit states that while he was receiving medical attention inside an ambulance, he saw Officer McClanahan lingering around, looking at and smirking at Plaintiff in an apparent attempt to intimidate him. Williams Aff. ¶¶ 20-25. Additionally, once Officer Van Faussien learned Plaintiff's identity, he: (1) verbally identified him as "the guy that gave McClanahan a ration of shit"; (2) asked where Officer McClanahan was; (3) asked again for Plaintiff's name; and (4) left to talk with McClanahan and another officer. Martin Video, at 32:37 - 33:52. The Court finds that, viewing this evidence in favor of Plaintiff, as it must at this stage, a reasonable jury could infer that Officers McClanahan and Van Faussien had a collective motive to retaliate against Plaintiff and were hostile against him.

As to Officer Stone, the evidentiary record reveals a factual dispute as to whether the errors contained in his accident report were accidental or intentional. As explained above, Officer Stone's Police Crash Report potentially contains three materially false statements of fact: (1) Aman's intoxication level; (2) Aman's driving speed; and (3) whether Aman's vehicle had a

18

steering defect.   Plaintiff contends that there is "no logical reason for Stone" to make such blatant errors "other than at the request and encouragement of McClanahan and Van Faussien."   ECF No. 112, at 22.

As to the first false statement, following a very serious accident where Aman lost control of his truck and careened off a bridge, Officer Stone reported that Aman had not been drinking after Aman's one-time self-serving denial that he had consumed any alcohol.   ECF No. 112-11, at 2; Stone Video, at 23:22 – 23:26. Later testing at the hospital, however, revealed that Aman's blood alcohol level was nearly <u>four times</u> the legal limit in Virginia. ECF No. 112-12; Va. Code § 18.2-266.   Plaintiff argues that this degree of intoxication coupled with how close Stone was when he talked with Aman raises significant doubt as to the veracity of Stone's report.   ECF No. 109, at 4; ECF No. 126, at 5-6.   This doubt is multiplied, argues Plaintiff, based on the fact that investigating officers heard from one eyewitness that: (1) Aman's vehicle was swerving <u>before</u> he jumped the median; and (2) the witness thought Aman was "asleep at first" as it seemed like "he was in a trance."[6]   ECF No. 112, at 2; Martin Video, 08:54 - 09:13. Body camara footage also reveals that two officers on the scene

---

[6] the eyewitness also told Officer Martin that Aman had hit a tree shortly before the accident, which further supports the inference that Officer Stone failed to conduct an appropriate investigation despite evidence suggesting that Aman was intoxicated.   Martin Video, at 09:00 – 09:07.

19

suspected that Aman had been drinking. _Id._ at 20:17 - 20:22; 25:16 - 25:18. Defendants, however, did not investigate whether Aman was intoxicated or contact the eyewitness and inquire about Aman's erratic driving before drafting the report containing <u>an express representation</u> that Aman "had not been drinking." ECF No. 109-7, at 2.[7]

Second, Officer Stone's report recounted that Aman was driving at the speed limit (35 m.p.h.) when he crashed into Plaintiff. ECF No. 112-11, at 1-2. This speed, however, was not supported by the officers' investigation, as one witness reported Aman going more than <u>double</u> the speed limit (75 m.p.h.), Martin Video, at 09:17 - 09:20, while Aman himself <u>admitted</u> he was driving 10 miles <u>over</u> the speed limit, Stone Video, at 22:59 - 23:06. In addition, the officers' body camera footage reveals that multiple officers stated that Aman was likely traveling at a high-rate of speed based the nature of the accident and the damage to Plaintiff's car. _Id._ at 22:01 - 22:11 (showing that prior to identifying Plaintiff as the other driver involved in the accident, Officer Stone told Officer Van Faussien that there were some witnesses saying that Aman was driving about 70 m.p.h. and Officer Van Faussien stating that the nature of the accident supported

---

[7] The "Drinking" section of the Police Crash Report had four different options to reflect varying levels of alcohol consumption, as well as options for "unknown" and "had not been drinking." Here, the report indicated "had not been drinking." ECF No. 109-7.

Aman driving at that speed); Martin Video at 33:28 - 33:33; 33:40 - 33:58. But Officer Stone did not use this information. Instead, without any reasonable explanation, Officer Stone reported that Aman was driving at the speed limit, 10 m.p.h. lower than Aman himself admitted.

Third, Officer Stone stated in the report that Aman's vehicle had a steering defect, apparently relying blindly on Aman's self-serving statement that he swerved left because his vehicle malfunctioned. ECF No. 112-11, at 2; Stone Video, at 09:18 - 09:38; 23:08 - 23:15. Stone's video camara footage reveals that an on-scene examination would have been difficult because Aman's vehicle landed in wetland close to a large body of water. But nothing in the record suggests that Officer Stone inspected the vehicle in the six days between the day of the accident and the day on which he filed the report. ECF No. 112-11, at 1. Plaintiff argues that this failure to investigate the vehicle's mechanical condition is particularly problematic because Aman's intoxication levels, driving speed, and an eyewitness account of Aman swerving and allegedly being in a trance, support the conclusion that Aman recklessly swerved left because he was drunk and speeding, not because of his vehicle's condition. ECF No. 112, at 2, 13-15.

These material factual misrepresentations — all cutting against Plaintiff's interest and all arguably unsupported by the objective evidence — combined with the officers' purported direct

or indirect bias against Plaintiff for accusing McClanahan of misconduct, create a factual dispute as to whether the misrepresentations in the report were accidental or intentional. Moreover, although Officer Stone did not have a motive to retaliate against Plaintiff before the crash, a reasonable jury could conclude that the accident report is so grossly inaccurate that the most likely explanation for the false statements is that biased Officers Van Faussien and McClanahan encouraged Officer Stone to falsify the report. Therefore, because there are genuine factual disputes as to whether: (1) Officer Stone misrepresented information in the report accidentally or intentionally; and (2) Officers McClanahan and Van Faussien encouraged or assisted Officer Stone in falsifying the report, Defendants' summary judgment arguments challenging the second element of Plaintiff's retaliation claim also fail.

### 3. Causal Relationship Between Defendants' Adverse Action and Plaintiff's Protected Activity

Regarding the third element — causation — Plaintiff must ultimately prove that there is a causal connection linking the Defendants' adverse action to his First and Sixth Amendment protected activity. Relevant to Defendants' summary judgment arguments, "to establish this causal connection, a plaintiff . . . must show, at the very least, that the defendant was aware of h[im] engaging in protected activity," and "some degree of temporal

proximity." <u>Constantine</u>, 411 F.3d at 501.   Officer McClanahan argues in his motion that because he: (1) was not aware that Defendant was recording their initial interaction; (2) did not know that Plaintiff claimed that he lied at the first trial; and (3) was not present at the Norfolk Circuit Court trial, he was not aware that Plaintiff engaged in First or Sixth Amendment protected conduct.[8]   ECF No. 101, at 9-10; 12-13.   Building upon that argument, Officers Van Faussien and Stone argue that because Officer McClanahan was not aware of Plaintiff's protected conduct, they did not know about this conduct either.   ECF No. 109, at 10-11.

The evidentiary record before the Court reveals, however, a genuine factual dispute as to whether the three officers were aware that Plaintiff had engaged in constitutionally protected activity by the time Officer Stone filed the apparently inaccurate Police

---

[8] Officer McClanahan also appears to argue that no evidence supports a temporal proximity "between the alleged Sixth Amendment protected activity and the alleged adverse action," contending that Plaintiff did not exercise his Sixth Amendment rights at the Norfolk Circuit Court trial — 15 days before the accident — because he did not introduce evidence there.   ECF No. 101, at 14.   First, as explained above, Plaintiff exercised his Sixth Amendment rights when he appealed his initial conviction to the Circuit Court and appeared on September 15, 2020, for a new public trial.   <u>Supra</u> Part IV.A.1.   Second, Officer McClanahan fails to show that there is an insufficient temporal proximity between the first trial in February of 2020 and the October 2020 Police Crash Report.   <u>See</u> <u>Price v. Thompson</u>, 380 F.3d 209, 213 (4th Cir. 2004) (finding, in the context of a failure to hire retaliation claim, that the plaintiff had established a causal connection despite nine to ten months passing between the protected activity and the adverse action because the adverse action occurred "at the first available opportunity"), <u>abrogation on other grounds recognized by</u> <u>Foster v. Univ. of Md.-E. Shore</u>, 787 F.3d 243 (4th Cir. 2015).

Crash Report. First, it is undisputed that Officer McClanahan was aware that Plaintiff exercised his Sixth Amendment rights when he first demanded a trial on the criminal trespassing charge at Norfolk General District Court because Officer McClanahan testified at such trial. ECF No. 112-3, at 2. Further, Plaintiff's sworn affidavit states that he accused Officer McClanahan of lying under oath at the same trial at which Officer McClanahan testified. ECF No. 112-1 ¶¶ 6-9. Additionally, it is reasonable to infer that McClanahan, as the arresting officer who would be a necessary witness, was notified of Plaintiff's demand for the second trial in Circuit Court. Therefore, Officer McClanahan fails to demonstrate that he was not aware of at least some of Plaintiff's First and Sixth Amendment protected conduct.

Similarly, Officers Van Faussien and Stone's motion for summary judgment fails to demonstrate the absence of a factual dispute as to whether they were aware of Plaintiff's constitutionally protected activities. First, contrary to their position that Officer McClanahan was not aware of the protected conduct, the evidence discussed immediately above suggests that Officer McClanahan had such knowledge. Second, the record shows that Officer Van Faussien and at least one other unnamed officer knew of Plaintiff's complaints about Officer McClanahan. ECF No. 112-9, at 3. Third, Officer Van Faussien referred to Plaintiff at the accident scene as the "guy who gave McClanahan a ration of

24

shit"; a comment made within feet of Officer Stone. Martin Video, at 32:36 – 32:46. This evidence supports the inference that Officer Van Faussien was aware of Plaintiff's constitutionally protected conduct. And as for Officer Stone, the fact that: (1) at least three other co-officers knew about the protected conduct; (2) Van Faussien commented to other officers, including Stone, about Plaintiff in relation to Plaintiff's protected conduct at the scene of the crash; and (3) Stone's crash report contained such gross misrepresentations made with limited, if any, investigation and in direct conflict with some of the evidence collected from the scene, create a factual dispute as to whether he was aware of Plaintiff's protected activity at the time he created the false report. While three officers expressly deny knowledge of Plaintiff's protected conduct in their depositions and sworn affidavits, where there is contrary evidence and the resolution of the genuine factual dispute turns on witness credibility, summary judgment is not appropriate. See Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991) (explaining that whether the testimony of a witness "should be believed is a credibility determination" that must be made by the jury).

*    *    *

Therefore, because there are factual disputes as to whether Officers McClanahan, Van Faussien, and Stone: (1) agreed to misrepresent facts in the accident report to prejudice Plaintiff;

(2) falsified the report; and (3) knew that Plaintiff had engaged in First and Sixth Amendment protected activity, Defendants are not entitled to judgment as a matter of law as to Plaintiff's retaliation claim.

### B. Qualified Immunity Defense – Retaliation Claim

Law enforcement officers sued under § 1983 enjoy qualified immunity "when performing their duties within the scope of their employment insofar as their conduct does not breach 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sigman v. Town of Chapel Hill, 161 F.3d 782, 786 (4th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense to liability, but is "an immunity from suit," and courts must therefore "scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation." Id. This protection "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Yates v. Terry, 817 F.3d 877, 884 (4th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

To determine whether an officer is entitled to qualified immunity, courts engage in a two-part inquiry. At the first step, the court must determine whether "the facts, taken in the light

most favorable to the non-movant, establish that the officer violated a constitutional right." Id. At the second step, the court must determine whether the constitutional right at issue was "clearly established." Id. As explained above, the Court finds that the evidentiary record, viewed in the light most favorable to Plaintiff, reveals genuine factual disputes as to whether the officers violated Plaintiff's right to be free from retaliation for engaging in conduct protected by the First and Sixth Amendments. Supra Part IV.A. Accordingly, the sole remaining question is whether Defendants violated a "clearly established" right. Yates, 817 F.3d at 884.

A clearly established right is defined as one that is "sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (cleaned up). "A right can be clearly established by cases of controlling authority in this jurisdiction or by a consensus of persuasive authority from other jurisdictions." Sharpe v. Winterville Police Dep't, 59 F.4th 674, 683 (4th Cir. 2023). When defining the scope of the right to determine if it is clearly established, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quotation marks omitted); Reichle, 566 U.S. at 664. That said, "defendants 'can still be on notice that their conduct

27

violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was unconstitutional." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 538 (4th Cir. 2017) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Officials who knowingly disregard the law cannot rely on the clearly established prong as a defense for their misconduct, and therefore, "when a defendant knows [their] conduct does not pass constitutional muster" the court need "not look to see if [they] violated clearly established precedent." King v. Riley, 76 F.4th 259, 265 (4th Cir. 2023). The party that raises the qualified immunity defense bears the burden of proving that the right was not clearly established at the time the violation occurred. Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

Here, Defendants' summary judgment motions argue that they are entitled to qualified immunity because no Court has found that their alleged method of retaliation — namely, falsifying a Police Crash Report to punish a citizen — constituted an adverse action in the context of a retaliation claim. ECF Nos. 101, at 17-18; 109, at 17-19. But in the context of a retaliation claim, the dispositive question is whether the defendant violated clearly established law, not whether courts have found the "very action in question [to be] unlawful." Robles v. Prince George's County, 302 F.3d 262, 270 (4th Cir. 2002). Interpreted properly, the question here is whether Plaintiff's right to be free from retaliation for

engaging in protected constitutional conduct was clearly established at the time of the relevant acts such that "the unlawfulness [of defendant's retaliatory conduct is] apparent." Id.; see Trulock v. Freeh, 275 F.3d 391, 405-06 (4th Cir. 2001) (explaining that "[i]t is well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right" and emphasizing that misuse of power is improper "even when the act of the public official, absent the retaliatory motive, would otherwise have been proper"); see also Rivers v. Squires, No. 23cv154, 2024 U.S. Dist. LEXIS 93469, at *8 (W.D.N.Y. May 24, 2024) (explaining that when determining whether a defendant's conduct violated a clearly established right, the "question is not whether [the defendant's] actions themselves were permissible, but whether it was permissible for [the defendant] to take those actions for purposes of retaliating against [the plaintiff]") (emphasis added).[9]

---

[9] The Court notes that Defendants' framing of the second prong of the qualified immunity inquiry is not only contrary to Fourth Circuit jurisprudence, but also contrary to the policy behind the qualified immunity doctrine. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 571 U.S. 3, 6 (2013). Here, Defendants appear to contend that unless binding precedent clarifies that a specific method of retaliation constituted an adverse action, an officer will be shielded from liability despite abusing their power to intentionally retaliate against a citizen. The officers' characterization of the qualified immunity test would not only extend this doctrine to protect "those who knowingly violate the law," but would also encourage malicious public actors to find innovative retaliatory methods to avoid civil liability for their intentionally wrongful conduct.

With that background, the Court addresses whether Defendants' have carried their burden to demonstrate that their alleged conduct did not violate "clearly established" law.[10]  The proper framing of the dispositive question in this case is whether Plaintiff's right to be free from retaliation for exercising his First Amendment rights — by recording his encounter with Officer McClanahan and pointing out that McClanahan testified falsely — and Sixth Amendment rights — by demanding a trial and challenging Officer McClanahan's testimony — were clearly established when Defendants purportedly falsified the police report.  Because it is both obvious, and clearly established, that a public official cannot abuse their power in order to "retaliate against an individual for the exercise of a valid constitutional right," Trulock, 275 F.3d at 406, the question is whether Defendants have demonstrated that it was not clearly established that Plaintiff's activities were constitutionally protected conduct.  Booker, 855 F.3d at 540.

Officers McClanahan, Stone, and Van Faussien, however, fail to demonstrate that it was not clearly established that Plaintiff's

---

[10] Although Plaintiff's opposition brief argues that Officer McClanahan waived his qualified immunity defense by waiting to raise it until the summary judgment stage, this argument fails because Officer McClanahan asserted qualified immunity in his answer to Plaintiff's second amended complaint.  ECF No. 112, at 24; ECF No. 75 ¶ 67; see also Sales v. Grant, 224 F.3d 293, 296-97 (4th Cir. 2000) (clarifying that a party is not required to "pursue the defense of qualified immunity on every occasion possible in order to preserve" the right to raise it later in the same proceedings).

actions constituted First or Sixth Amendment protected conduct.
First, the officers do not contest that: (1) Plaintiff exercised
his First Amendment rights when recording his encounter with
Officer McClanahan; or (2) that such right was clearly established
at the time.  Second, the officers do not dispute that Plaintiff
engaged in clearly established protected speech when he spoke in
open court and asserted that Officer McClanahan's testimony was
false.[11]  Third, Defendants fail to demonstrate that Plaintiff did
not engage in clearly established Sixth Amendment protected
conduct when he: (1) demanded a trial in Norfolk General District
Court; (2) confronted/challenged Officer McClanahan's purportedly
false testimony at that trial; (3) appealed his conviction, thus
demanding a new trial in Norfolk Circuit Court; and (4) appeared
at the second trial ready to confront McClanahan's testimony.  See
United States v. Smith, 117 F.4th 584, 596 (4th Cir. 2024) ("The

---

[11] Although, as noted by the Fourth Circuit, an individual's right to record
their interaction with a police officer was clearly established by 2023,
Williams, 122 F.4th at 89 (citing Sharpe v. Winterville Police Dep't, 59
F.4th 674, 681 (4th Cir. 2023), this Court notes that it is arguably unclear
whether that right was clearly-established as of October 2020, the date the
police report was filed in this case.  Compare Sharpe, 59 F.4th at 683
(holding that it was not clearly established as of October of 2018 in the
Fourth Circuit "that forbidding a passenger from livestreaming their own
traffic stop violated the First Amendment"); with People for the Ethical
Treatment of Animals, Inc. v. N.C. Farm Bureau Fedn., Inc., 60 F.4th 815,
845 (4th Cir. 2023) (Rushing J. dissenting) (listing cases from other
circuits decided prior to October of 2020 finding that the First Amendment
protects the right of individuals to record "matters of public interest in
public spaces because of its connection with speech of public concern").
This Court, however, does not address this issue both because it was not
raised and because it appears largely irrelevant due to the fact that
Plaintiff also relies on his speech in open court.

Sixth Amendment provides that a criminal defendant has the right to a public trial."); United States v. Abu Ali, 528 F.3d 210, 245 (4th Cir. 2008) ("The Sixth Amendment guarantees that 'in all criminal prosecutions, the accused shall enjoy . . . the right to be confronted with the witnesses against him.'") (quoting U.S. Const. amend. VI).   Therefore, because Defendants have failed to demonstrate that Plaintiff's did not engage in clearly established First and Sixth Amendment conduct, they are not entitled to qualified immunity.   Accordingly, Defendants' respective motions for summary judgment are **DENIED** as to the retaliation claim.

### C. Conspiracy Claim

Related to his retaliation claim, Plaintiff's second claim for relief asserts that Officers McClanahan, Van Faussien, and Stone engaged in a conspiracy to deny Plaintiff his constitutional rights.   ECF No. 48 ¶¶ 44-46.   To establish a civil conspiracy claim, a plaintiff must present evidence that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in deprivation of [the plaintiff's] constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).

Defendants first argue that they are entitled to summary judgment as to Plaintiff's conspiracy claim because the evidentiary record fails to demonstrate that the officers acted jointly or committed an overt act in furtherance of the conspiracy.

ECF No. 101, at 15-16; ECF No. 109, at 14-16.  But as the Court explained above, the evidentiary record reveals genuine factual disputes as to whether Officers McClanahan, Van Faussien, and Stone: (1) colluded to misrepresent facts in the accident report to limit Plaintiff's recovery of civil damages; and (2) falsified the report (an overt act).  Therefore, because there is a genuine dispute of material fact as to whether Officers McClanahan, Van Faussien, and Stone engaged in a conspiracy, the officers are not entitled to judgment as a matter of law.

In their second challenge to the conspiracy claim, Defendants contend that Plaintiff's claim is barred by the intracorporate conspiracy doctrine.  ECF No. 101, at 15-16; ECF No. 109, at 13-16. "The intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own."  Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 352 (4th Cir. 2013).  Because the "acts of corporate agents are acts of the corporation itself . . . corporate employees cannot conspire with each other or with the corporation." eplus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) (emphasis added).

In response, Plaintiff argues that two exceptions to the intracorporate conspiracy doctrine apply in this case: the "personal stake" exception, and the "unauthorized acts" exception. Buschi, 775 F.2d at 1252.  The first exception generally applies

"where a co-conspirator possesses a personal stake independent of his relationship to the corporation." ePlus Tech, 313 F.3d 166 at 179.  The second exception is applicable when the acts of the agent in furtherance of the conspiracy were "unauthorized" by the corporation.  Buschi, 775 F.2d at 1252-53.[12]

Defendants' reply briefs offer no viable counter to Plaintiff's assertion that there are potentially multiple avenues to prove an exception to the intracorporate conspiracy doctrine. Frankly, it is unclear what the City stood to gain, if anything, from the spiteful and retaliatory conduct alleged in this case. When all reasonable inferences are made in Plaintiff's favor, it remains plausible that the entire motivation behind the conspiracy was the officers' "independent personal stake," either in exacting retribution for public embarrassment, or in colluding with fellow officers to discourage Plaintiff (or others) from making public accusations (even truthful ones) against officers that could lead to negative employment consequences.  To the extent it is unclear whether Defendants' purported decision to falsify the police report was motivated in part or solely by their personal stake,[13]

---

[12] To the extent Plaintiff separately argues that the doctrine does not apply because the City of Norfolk is no longer a party to this lawsuit, such position is mistaken as "suing the agents individually does not destroy 'the immunity granted under the doctrine.'" Painter's Mill Grille, 716 F.3d at 353 (quoting Buschi v. Kirven, 775 F.2d 1240, 1252 (4th Cir. 1985)).

[13] There is no evidence in the summary judgment record suggesting that any supervisors acting on behalf of the City were aware of the false report. Looking backwards in time, there is likewise nothing in the record suggesting

34

such matter is a question for the jury.  Painter's Mill Grille, 716 F.3d at 353.

It is similarly unclear based on the state of the current record what evidence, if any, demonstrates that the City "authorized" its officers to falsify a police report for the purpose of exacting revenge against a citizen.  The conduct of issuing the report was surely within the officers' official duties, but the conduct of intentionally falsifying the report, an act that offered no identifiable benefit to the City and likely could only be cause for embarrassment were it uncovered, presumably was not.  Accordingly, the current record suggests that a reasonable factfinder could conclude that the falsification of the report was unauthorized.  Because disputed facts and disputed inferences directly impact whether Defendants are shielded by the intracorporate immunity doctrine, the Court **DENIES** summary judgment as to Plaintiff's conspiracy claim.

### D. Intentional Infliction of Emotional Distress Claim

Plaintiff's final claim asserts that Officers McClanahan, Van Faussien, and Stone's intentional conduct inflicted physical and emotional injuries on Plaintiff.  ECF No. 48 ¶¶ 47-53.  The elements of an intentional infliction of emotional distress claim under Virginia law are: "(1) the wrongdoer's conduct was

---

that the City had an interest in wrongfully convicting an innocent person based on perjured testimony or an interest in discouraging its citizens from demanding truthful testimony from officers at criminal trials.

intentional or reckless, (2) the conduct was outrageous and intolerable, (3) there was a causal connection between the wrongdoer's conduct and the emotional distress, and (4) the emotional distress was severe." Harris v. Kreutzer, 271 Va. 188, 203, 624 S.E.2d 24, 33 (2006).

Defendants first argue that because they did not retaliate against Plaintiff by intentionally or recklessly creating a false report, Plaintiff's claim necessarily fails. ECF No. 101, at 18-19; ECF No. 109, at 19-21. However, as explained above, genuine factual disputes regarding whether the officers intentionally falsified the police report prevent this defense from prevailing at the summary judgment stage.

Defendants' second argument is that their actions were not sufficiently outrageous or intolerable to support an IIED claim under Virginia law. To satisfy the second element of an IIED claim, it is not enough that the defendant "acted with an intent which is tortious or even criminal," rather, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Russo v. White, 241 Va. 23, 27, 400 S.E.2d 160, 162 (1991). "The outrageousness requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and

mere hurt feelings are involved." Harris, 271 Va. at 203, 624 S.E.2d at 33 (quotation marks omitted).

When, as here, a defendant challenges a plaintiff's ability to satisfy the second IIED element, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974) (quoting Restatement (Second) of Torts, § 46, at 77). However, where "reasonable persons may differ," as to whether the conduct is sufficiently outrageous, the question becomes one for the jury. Id. (quoting Restatement (Second) of Torts, § 46, at 77).

Even with the benefit of the above-cited Virginia case law, defining the contours of what is sufficiently outrageous to support an IIED claim remains difficult. See Almy v. Grisham, 273 Va. 68, 78-79, 639 S.E.2d 182, 187 (2007) (acknowledging the absence of "an objective definition" of the term "outrageous"); DeLeon v. McGaha, 109 Va. Cir. 264, 270 (2022) ("There is little case law discussing what is outrageous and what is not. In the words of the Fourth Circuit applying Virginia law, 'the question is inescapably one of legal judgment based upon total context.'" (quoting Gaiters v. Lynn, 831 F.2d 51, 53 (4th Cir. 1987))). As described by a leading treatise on tort law, requiring proof of "truly outrageous" conduct does not provide "anything like a

predictable standard"; however, a survey of caselaw suggests "four important markers" that "lend support for a finding of outrage." Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts § 386 (2d ed.). These markers are, when the defendant: (1) "abuses power or position, that is, by using a position of dominance; (2) takes advantage of or emotionally harms a plaintiff known by the defendant to be especially vulnerable; (3) repeats or continues undesirable acts, particularly when the plaintiff cannot avoid them; or (4) commits acts of physical violence, or threats of violence or serious economic harm to plaintiff . . . ." Id. (footnotes omitted). Here, though arguably a close call, the Court finds that reasonable minds could differ as to whether Defendants' conduct rose to the level of extreme and outrageous behavior.

Considering the first marker, the Fourth Circuit has characterized the allegations in this case as involving "a significant power imbalance in Williams' relationship with the police, as he is a Black man who had recently exposed an officer's perjury." Williams, 122 F.4th at 90.[14] This power imbalance is exacerbated by the fact that multiple officers were purportedly coordinating against Plaintiff's interests and rights. See Almy, 273 Va. at 78, 639 S.E.2d at 187 (finding that reasonable persons

---

[14] The Fourth Circuit, of course, was evaluating the allegations in the complaint and not the summary judgment record. However, nothing in the summary judgment record undermines the Fourth Circuit's observation about the power imbalance at issue.

could view the alleged conduct as outrageous in a case involving a coordinated scheme to falsely accuse the plaintiff of writing letters alleging marital infidelity, which involved the defendants causing a handwriting expert to "issue a false report implicating" plaintiff, and then reporting plaintiff to the police).  Stated another way, the "extreme lengths" to which the Defendant officers "were willing to go to punish Williams" for defending his constitutional rights is "egregious" as the police "eschew[ed] their duties and lie[d]" with a vengeful motivation, acting in direct contravention to their sworn oaths as law enforcement officers.  Williams, 122 F.4th at 90; see Magallon v. Wireless Unlimited Inc., 85 Va. Cir. 460, 468-69 (2012) (explaining, in the context of an employee's IIED claim against her supervisor based on an alleged sexual assault and ongoing harassing and threatening comments at work, that the supervisor's conduct could be categorized as "intolerable" given "the position of authority held by [the defendant] over [the] [p]laintiff").

Second, Defendants' alleged retaliatory actions began on the scene of a very serious car accident at a time when Plaintiff was being treated inside an ambulance and "severely injured and traumatized in the immediate aftermath of a high-speed crash." Williams, 122 F.4th at 90; see Hicks v. Martin, 106 Va. Cir. 229, 233 (2020) (considering the allegation that the defendant had "prior knowledge of PTSD, a commonly known traumatic condition"

when concluding that the "confluence of factual allegations" of abuse "create[d] a jury question concerning IIED"). The fact that the first alleged retaliatory act occurred when Plaintiff was in such a vulnerable state surely could be interpreted as increasing the outrageousness and callousness of Defendants' misconduct.

Third, Defendants' alleged misconduct could reasonably be interpreted as not just an isolated act, but instead a continuation of an abuse of power that began months earlier. The fact that Plaintiff alleges he had previously endured an abuse of power from one of the same officers who conspired to falsify the Crash Report only increases the likelihood that he would endure severe emotional harm. Notably, Plaintiff was on the scene of a crash that was not his fault and he could not choose the officers dispatched to assist him. However, rather than assisting him, he claims that the officers willingly abdicated their duty as sworn law enforcement officers and conspired to cause Plaintiff economic harm. This purported conduct, if it occurred as Plaintiff claims, goes far beyond abusive remarks resulting in hurt feelings; it is arguably enough to undermine a citizen's trust in the integrity of the police. Cf. Perk v. Worden, 475 F. Supp. 2d 565, 570 (E.D. Va. 2007) (finding that allegations that a licensed attorney knowingly filed state actions to collect debts in the wrong venue, verbally abused the plaintiff over the telephone, and then "blatantly lied to her" about a hearing date "in order to secure a default

judgment" was sufficient to create a jury question regarding the outrageousness of the behavior).

After evaluating the entire course of relevant behavior alleged by Plaintiff, reasonable minds could differ as to whether Defendants' intentional acts leveraging their position of power, because of a vendetta in the immediate aftermath of a very serious crash, go far "beyond all possible bounds of decency" and are intolerable in our community. Russo, 241 Va. at 27, 400 S.E.2d at 162; cf. Va. Code § 18.2-472 (indicating that if a public officer "fraudulently make[s] a false entry," or alters records belonging to their office, they are not only guilty of a crime and must forfeit their office, but that they shall "be forever incapable of holding any office of honor, profit or trust under the Constitution of Virginia") (emphasis added). Accordingly, the Court **DENIES** Defendants' summary judgment motions as to Plaintiff's IIED claim.

### V. CONCLUSION

For the reasons discussed above, Officer McClanahan's summary judgment motion, ECF No. 100, and Officers Stone and Van Faussien's summary judgment motion, ECF No. 108, are **DENIED.** Counsel for all parties are **INSTRUCTED** to confer no later than Tuesday, September 9, 2025, to determine whether the resumption of settlement discussions would be fruitful and to notify the Court before 5 p.m. on that day of their conclusion.

The Clerk is **REQUESTED** to forward a copy of this Opinion and Order to counsel of record for all parties.

**IT IS SO ORDERED.**

/s/ _____

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September  4  , 2025

42